# CASES DETERMINED

# January Term, 1922.

FARMERS' CO-OPERATIVE PACKING COMPANY OF LA CROSSE,
Respondent, vs. BOYD and others, Appellants.

*June 3, 1921—January 10, 1922.*

*Fraud: Sale of packing plant to co-operative association: Representations as to value: Duty of purchaser to investigate: Degree of diligence required: Special verdict: Omitted issues: Disposition of case.*

1. In an action for damages sustained by reason of an alleged conspiracy on the part of the defendants in selling a packing plant to a co-operative association, the evidence (set out in the opinion) is considered not to establish a cause of action.
2. Where the value of property is largely a matter of judgment, puffing of the value by the vendor does not make him legally liable where the purchaser has an opportunity to examine the subject of the sale.
3. Where the attention of the trial court was properly called to an issue tendered by the pleadings and such issue was not submitted to the jury, it can make no finding thereon either by virtue of sec. 2858m, Stats., or otherwise, and the judgment rendered cannot be sustained by a presumption that findings supporting it were made.
4. Under such circumstances, where the facts are undisputed or it is clear that only one proper conclusion thereon can be reached by reasonable men, the appellate court will determine the issue; but where the evidence as to the issue is conflicting or susceptible of different conclusions, the case will be reversed, and remanded with directions to submit the issue to the jury.
5. A statement of an agent of a packing plant that it would prove profitable in the hands of the purchaser was an expression of mere opinion as to future success and could not form a basis of misrepresentation.
6. Where the question of value becomes a subject of discussion between buyer and seller, the buyer is under a duty to investigate where it can be conveniently done.

7. Where plaintiff was engaged in the business of buying a pack-
    ing plant, it must exercise the ordinary and reasonable dili-
    gence of a buyer and had no right to rely upon representations
    of value made by interested parties.

APPEAL from a judgment of the circuit court for La
Crosse county: E. C. HIGBEE, Circuit Judge. *Reversed.*

Action to recover damages sustained by plaintiff by rea-
son of its purchase of the Langdon-Boyd Packing Com-
pany's plant situated at La Crosse, Wisconsin, at an exorbi-
tant price, being induced thereto by an alleged fraudulent
conspiracy on the part of the defendants. The defendants
named in the complaint were Andrew Boyd, *Isabella Boyd,*
Langdon-Boyd Packing Company, a corporation, *George
W. Burton, Frank P. Hixon, Joseph B. Funke, Carl F.
Michel,* Henry Gund, F. A. S. Price, *Ira M. Chryst,* R. A.
Hall, and the *National Bank of La Crosse,* a corporation.

The defendants Andrew Boyd, Langdon-Boyd Packing
Company, F. A. S. Price, and R. A. Hall were not served
and made no appearance.

The jury by a special verdict found that (1) the defend-
ants *Isabella Boyd, George W. Burton, Frank P. Hixon,
J. B. Funke, Carl F. Michel,* Andrew Boyd, *Ira M. Chryst,*
F. A. S. Price, R. A. Hall, and the *National Bank of La
Crosse* joined and co-operated with Andrew Boyd in a con-
spiracy to promote the organization of the plaintiff *Farmers'
Co-operative Packing Company* with the purpose and intent
to cause the Langdon-Boyd Company to be sold to said
plaintiff corporation when formed, at the price and in
accordance with the terms of the proposition dated April 14,
1913, described as Exhibit 10 in this case; that they, by
means of false representations, concealments, or deceits with
respect to the value of the assets of the business, prosperity,
and good will of the Langdon-Boyd Packing Company or
the persons interested in such proposition, induced the pur-
chase and acquirement of said plant and property by the
plaintiff corporation; (2) the fair market value of the build-

.ings, machinery, and real estate of the Langdon-Boyd Packing Company acquired by the plaintiff corporation on the 13th day of June, 1914, was $57,200; and (3) the amount paid out of ·the corporate treasury of the plaintiff corporation as commission for the sale of its stock under the contract made between Andrew Boyd and F. A. S. Price was $34,497.94.

It appeared that the purchase price of the Langdon-Boyd packing plant, exclusive of stock and accounts receivable, was $122,914.36, and the court rendered judgment for plaintiff for the difference between such purchase price and the market value of the plant as found by the jury plus the $34,497.94 paid as a commission to Mr. Price, in all for the sum of $101,129.95 damages and costs.

From such judgment the defendants *Isabella Boyd, George W. Burton, Frank P. Hixon, J. B. Funke, C. F. Michel, Ira M. Chryst,* and the *National Bank of La Crosse* appealed.

The defendant Henry Gund was found not to have participated in the conspiracy. The defendant *Burton* was president of the *National Bank of La Crosse* and the defendants *Hixon, Funke,* and *Michel* were directors thereof. *Burton* and the bank owned preferred stock in the Langdon-Boyd Packing Company, hereinafter called the Packing Company. It was organized in 1907 with a capital stock of $100,000 common and $50,000 preferred, all of the par value of $100 per share. Only about $34,000 of the preferred stock was issued. The common stock was issued as follows: Andrew Boyd, 600 shares; Ann Langdon, 700 shares; John E. Langdon, 100 shares; *Isabella Boyd,* 100 shares. The stock was issued in consideration of the conveyance to the corporation of the assets of the Langdon-Boyd Company partnership which had theretofore existed, and which were valued at the sum of $100,000. The Packing Company continued to operate from its creation till the sale to plaintiff on June 13, 1914. It was a heavy borrower from the bank, its indebtedness ranging from $26,000 in

1907 to about $55,000 in March, 1914, but it was always granted the line of credit it required. Annual statements of assets and liabilities were rendered to the bank and they always showed a surplus on hand, though there was a net loss in 1911 of $635.68. The assets of the company exclusive of treasury stock ranged from $163,819.18 in 1907 to $207,728.95 in 1912, according to such statements. There is evidence tending to show that the financial condition of the Packing Company was considerably less favorable. It is a fair inference from all the evidence that the years mentioned had not been prosperous ones for the plant.

In 1902 the American Society of Equity was incorporated under the laws of the state of Indiana with, among other objects, that of promoting the formation of co-operative trading companies to be organized for the purpose of distributing farm products and the necessities of life. As a corporation it could not operate a trading company or plant and this became known to Boyd before the sale was made. It had a branch in this state known as the Wisconsin Union of the American Society of Equity. It was not a separate corporation, but was chartered by the American Society of Equity and had the same objects as the latter. In 1913-14 it had from ten to fifteen thousand members, and its affairs were managed by an executive board consisting of the president, vice-president, and a board of directors. Its president was D. O. Mahoney, vice-president J. H. Carnahan, secretary M. Wesley Tubbs, and its board of directors were J. H. Carnahan, W. M. Rowe, and C. E. Hanson. During the same time *Ira M. J. Chryst* of St. Croix county was president of the American Society of Equity.

J. H. Carnahan was also state organizer of the Wisconsin Union, and chairman of its packing-plant committee and of the same committee of the American Society of Equity. He had been chairman of the Wisconsin Union since 1908. In 1909 that committee visited and inspected the Abattoir Packing plant of La Crosse and also inspected the Packing Com-

pany plant and spoke with Andrew Boyd about the future of co-operative packing plants. Boyd expressed himself as skeptical in the matter.

In 1912 Carnahan again visited the Packing Company plant, and as a result of a conference with Boyd the latter stated that he might consider a proposition to sell his plant to the Society of Equity, and he was invited to appear before the executive board of the Wisconsin Union to be held at Madison in March, 1913. Boyd attended the meeting and made an oral offer to sell the Packing Company plant, whereupon the board took the following action:

"Motion by Mr. Christman that a committee be appointed by the president to investigate the Langdon-Boyd packing plant at La Crosse, and, if deemed advisable, to work out a plan to take over said plant and arrange for financing same. Seconded by Mr. Emerton. Carried. Chair appointed Mr. Christman, Mr. Carnahan, and Mr. Davidson. Motion made by Mr. Carnahan that in case Mr. Davidson cannot serve upon this committee it is the sense of this committee that D. O. Mahoney be the other member of such committee. Seconded by Mr. Christman. Carried."

Thereafter the committee thus appointed visited the Packing Company and with the exception of Mahoney spent a whole day examining the plant. After such examination Boyd was requested to submit a proposition for the sale of the plant in writing which he did under date of April 14, 1913, as follows (being Exhibit 10):

"A. H. Christman,
            "Menomonie Falls, Wisconsin.
   "Dear Sir: After giving careful consideration to the question of selling our plant and business to the Wisconsin Society of Equity and talking same over with the other common stockholders, I have decided it would probably be to the mutual advantage of myself and your company to do so. The possibilities in the increased business here and of starting other plants when this one shows the advantage of such arrangement, is the incentive for this decision. We

will sell and transfer the property of our company under the following conditions:

"Real estate, which includes the ground upon which the plant is now situated, the lots across the street and opposite the plant, and one lot in the resident part of the city, for $30,200; all machinery and plant at the book value of $97,771.37 less depreciation $5,057.01, $92,714.36; live stock, stock in trade, merchandise, horses, wagons, tools, and implements to be fixed by inventory at time of transfer, book accounts at face value, the same to be guaranteed by common stockholders of the Langdon-Boyd Packing Company. The good will of our company I consider of value, as if you wish to start a new company it would take an investment of about a year to get the plant built and in operation and another year or more to perfect a cure, get trade established, and a reputation on your goods, which would mean a loss of interest on the amount invested for two years at least, and this would amount to $25,000 or $30,000. Our plant is a going concern, and the day after transfer is made will be making money on the investment.

"I will state in this connection that it is mutually agreed by the common stockholders of the present company that if this inventory and transfer should more than equal the par value of the common and preferred stock, together with the indebtedness outstanding at time of transfer, that they would agree to accept such par value and indebtedness in full payment.

"I would suggest that a meeting of your executive board be called at once in Madison, and I will come to such meeting and, if all is agreeable, to start immediate and active arrangements for incorporating the new company and placing stock.

"Kindly let me hear from you at once in regard to this, as after making this decision I am anxious to see the new company in active operation.

"Yours truly,
"ANDREW BOYD."

"P. S. Unanimous consent of all stockholders is necessary to sell and transfer a going stock company, but I have no doubt but that I can secure such consent."

At the next meeting of the executive board, which was

held at Madison June 6 and 7, 1913, Boyd's proposition was submitted and it was resolved that, inasmuch as the board considered it favorably, a committee be appointed to solicit stock for the same. A committee of six was appointed, one of whom could not serve, so Carnahan appointed Andrew Boyd a member, he having shortly before joined the union. A letter was sent to each member by the secretary stating that no compensation was provided for, but that if the deal took tangible form a commission would be allowed on all stock sold, to be charged up to promotional expense. The next meeting of the executive board was held at Milwaukee on the State Fair grounds September 10, 1913, at which time the first subscriptions for stock were taken and where Boyd first met *Ira M. J. Chryst,* who was then the president of the American Society of Equity. He refused to subscribe for stock until he had looked into the matter further, and later in November at St. Paul *Chryst* told Carnahan that he would assist if they would incorporate the new company under the Wisconsin Co-operative Association Law. Later he visited the Packing Company plant and spent about half a day examining it and expressed himself satisfied. From then on he became an active promoter of the plaintiff company, addressing meetings and selling stock.

At the Milwaukee meeting the board received and accepted an invitation to hold the next annual convention of the society at La Crosse. This was held on December 3, 4, and 5, 1913, and was attended by over 400 members, it being generally known that the question of purchasing the Packing Company plant would come up for action.

The convention was addressed by a number of men, among others the mayor of La Crosse, the secretary of the board of trade, the governor of the state, the president of the Wisconsin Union, and almost all of them mentioned the prospective purchase of the Packing Company plant as a desirable thing and worthy of consideration.

A committee consisting of J. H. Carnahan, M. P. Laurson, *Ira M. J. Chryst*, A. O. Wangen, James Allison, Frank Wilde, and Ben Lang was appointed to make an inspection of the plant and report and members generally were invited to visit it, and many did so. After the committee had inspected the plant it made this report:

"We, your committee on co-operative packing plant, beg leave to report as follows:

"We unanimously recommend the establishment of a co-operative packing plant under the co-operative laws of 1911. We further report that we, your committee, have inspected the Langdon-Boyd packing plant of La Crosse, which was inspected and recommended by your state board at the board meeting in July, 1913, and we recommend that this convention take such action as will lead to the completion of the purchase proposition as submitted by Mr. Boyd to our executive board of the Wisconsin State Union at their board meeting held in Milwaukee in September, 1913."

The written proposition of Andrew Boyd was read to the convention at the request of a delegate and after discussion the report of the committee was unanimously adopted. At the last session of the convention, nothing further having been done, upon motion of Mr. Carnahan the packing-plant proposition was referred to the committee on department unions to report to the convention, and that they get the stockholders together to organize the department of the packing-plant proposition. The committee on department unions consisted of *Ira M. J. Chryst,* Jens Davidson, and H. E. Holmes. It met in the evening and decided that the same committee that had been handling the packing-plant proposition should continue with it.

A vigorous subscription campaign followed, chiefly under the direction of defendant F. A. S. Price of Chicago, who was hired by Boyd in early March, 1914, to have entire charge of the selling of stock in the new corporation, which was to be known as the *Farmers' Co-operative Packing Com-*

*pany of La Crosse,* with a capital stock of $250,000. The form used for the subscription of substantially all of the first $100,000 of stock was as follows:

"*Farmers Co-operative Packing Company of La Crosse, Wisconsin*—Authorized capital $250,000.

"I hereby subscribe for ———— shares of the capital stock of the *Farmers Co-operative Packing Company,* and agree to pay one hundred ($100) dollars per share for same as soon as the amount of stock necessary to organize the corporation has been subscribed, it being understood that the *Farmers Co-operative Packing Company* will, when organized, take over the plant, assets, and business of the Langdon-Boyd Packing Company of La Crosse, Wisconsin, upon the terms proposed to and accepted by the executive board of the Wisconsin State Union of the American Society of Equity and ratified by the Wisconsin state convention of said union at La Crosse, Wisconsin, December 3 to 5, 1913."

A committee appointed by the La Crosse board of trade to solicit subscriptions declined to do so because some of the members thought the price asked was too high, and defendants Boyd and *Burton* were so informed. *Burton* asked if it was necessary that the committee report. It never did make a report.

At Boyd's request made to *Burton* three of the defendants, *Hixon, Funke,* and *Michel,* subscribed for ten shares each in the new company, in reality on behalf of the bank, which turned in a part of its preferred stock in the Packing Company in payment. Later, April 4th, *Burton,* and April 30th Gund, subscribed for ten shares of stock each. The fact that these business men as well as many others not connected with this case subscribed for stock was widely advertised in the La Crosse papers, and there was some evidence from subscribers of stock to the effect that they relied upon the good business judgment of these men in making their subscriptions, but others said they did not.

In April, 1914, *Chryst* was informed that sufficient stock had been subscribed to authorize the incorporation of the

new company. The articles of incorporation were formulated by Tank, secretary of the American Society of Equity, Price, and *Chryst* from a rough draft prepared by Mr. Price, and as adopted provided for an authorized capital stock of $250,000; that no stockholder could hold more than $1,000 of stock or be entitled to more than one vote. The incorporation was under the provisions of secs. 1786*e*—1 to 1786*e*—17 of our Statutes, and the articles were executed April 27, 1914, by Joseph H. Carnahan, *Ira M. J. Chryst,* Henry Garbers, Dell H. Baker, and H. G. Tank.

May 4, 1914, an organization meeting was held at La Crosse, attended by several hundred subscribers of stock, at which the articles of incorporation were adopted and the stock subscriptions accepted. The first stockholders' meeting was held immediately after the adjournment of the organization meeting and was attended by a like number of subscribers of stock. At such meeting directors were elected, eighteen in all. The same evening the first directors' meeting was held and the following officers elected: *Ira M. J. Chryst* president; Andrew Boyd first vice-president; J. H. Carnahan second vice-president; F. A. S. Price third vice-president; O. J. Sorenson fourth vice-president; A. O. Wangen fifth vice-president, and A. W. Johnson secretary and treasurer. Boyd was also unanimously elected general manager at a salary of $2,500 per year.

At this meeting the proposition for the sale of the Packing Company plant as contained in Exhibit 10 was then presented to the meeting. Brown, one of the directors, expressed the view that the price was high and that an appraisal be had. Boyd said he was willing that his plant be appraised by an appraisal company and turned over to the new company at the appraised value whether higher or lower than his offer. Tank, who was present, suggested that a motion be made to accept a new appraisal and pay the price shown by it, but none was made. Instead, Boyd's original proposition was accepted unanimously, and it was

ordered that, as soon as $100,000 had been paid in, a special meeting of the board be called for the purpose of making the transfer of the property.

Upon the suggestion of Mr. Tank the executive committee, which had power to act when the board of directors was not in session, was increased from five to seven members because Boyd as general manager, and Johnson who worked under him and was secretary and treasurer, were *ex officio* members of such committee, Tank calling attention to Boyd's interest in making the sale.

In view of the remarks of Mr. Brown as to the price and of Mr. Tank as to Boyd's desire to sell, Boyd tendered his resignation the next day as vice-president and general manager, sending a copy thereof to each director and officer, but at the June 13th meeting the board of directors unanimously refused to accept the resignation. Such meeting was the second meeting of the board of directors and lasted from 10:40 a. m. to late in the afternoon. Owing to more subscriptions having been secured, ten additional directors were chosen, one of whom was present and one old director absent, leaving eighteen directors in attendance. Early in the afternoon a motion was made to reconsider the motion of May 4th accepting the Boyd proposition and it was carried by a vote of 12 to 6. And by a vote of 11 to 7 the action accepting the Boyd proposition was rescinded. A discussion then ensued as to the value of the plant, some being in favor of a new appraisal. Boyd repeated his offer made May 4th as to a new appraisal. The directors had before them appraisal reports made by F. R. Schwalbe, John A. Miller, and Ori J. Sorenson, all contractors and builders of good standing in La Crosse, as to buildings, and as to land by S. W. Anderson and Frank G. Roth, both engaged in the real-estate business in La Crosse, and as to machinery by A. A. Schneider, an engineer in the employ of the John Gund Brewing Company. The adoption of these reports was carried by a vote of 10 to 4. It was then moved and seconded

that the purchase proposition as accepted May 4th be ac-
cepted and that the officers of the company be instructed to
make the transfer at once.  Before the motion was put,
Director Bosshard from La Crosse tendered his resignation
and left the meeting.  The motion passed with one vote of
Director Wolfe against it and Director Garbers not voting.

The transfer took place June 13, 1914, and payments upon
the purchase price were made from time to time as late as
December, 1914, and the plaintiff continued to operate the
plant from the time it took possession until the early part of
1917.  Andrew Boyd resigned as general manager in August,
1915, and from then on D. H. Baker, who had before been
superintendent of the plant, managed the affairs of the com-
pany until the early part of 1917, when it closed down.  Since
then no effort has been made to operate the plant, but several
unsuccessful efforts to get a quorum of stockholders for the
purpose of re-financing it were made before this suit was be-
gun, which was in the fall of 1919.

For the appellants there were briefs by *George H. Gor-
don, Law & Gordon* of La Crosse and *Harry L. Butler* of
Madison, and oral argument by *Mr. George H. Gordon* and
*Mr. Butler.*

*Jesse E. Higbee* of La Crosse, *C. W. Graves* of Viroqua,
and *R. B. Graves* of Sparta, for the respondent.

The following opinion was filed November 15, 1921:

VINJE, J.  The foregoing statement of facts is an outline
statement only and does not purport to embody detailed
facts.  It does, however, contain the main facts around which
the evidentiary facts cluster.  The complaint alleged a fraud-
ulent conspiracy and the proof properly took a wide range,
perhaps in a number of instances on behalf of plaintiff wider
than the rules of evidence permit even in such cases.  It is
therefore not practical in a judicial opinion to set forth the
detailed evidence, especially in a case such as this, where the
controlling questions passed upon by the court below are

questions of fact whose correct solution is of little value to the legal profession. But it does not follow from this that all the evidence has not received careful consideration. The importance of the case, in view of the amount involved and the stigma cast by the verdict upon the reputations of prominent business men and farmers of the state, has served to emphasize judicial duty, though it is hoped such added emphasis is not necessary in any case. In addition to the importance of the case, the very exhaustive and earnest briefs and oral arguments of counsel on both sides not only incited but materially assisted judicial inquiry.

A careful study of the case has been made by each member of the court with the result that it is its best judgment that no cause of action exists in favor of plaintiff against the appealing defendants or against any of them.

It is the settled law of both England and America that a buyer is required to notice such qualities of the goods purchased as are reasonably within his observation, and this is especially true as to value, which is largely a matter of judgment, and hence though value be puffed by the vendor such puffing does not render him legally liable where the purchaser has an opportunity to examine the subject of the sale. 2 Kent, Comm. (14th ed.) 478; Story, Sales (3d ed.) § 348; 1 Bouv. Law Dict. 438.

It will be noticed that the special verdict did not submit to the jury the issue as to whether or not plaintiff in fact relied upon the representations made by the defendants or whether it was justified in relying upon them, though such issue was tendered by the pleadings and was requested by the defendants to be submitted to the jury. Where the trial court's attention is properly called to an issue and it is not submitted to the jury it can make no finding thereon either by virtue of sec. 2858m, Stats., or otherwise, and the judgment rendered cannot be sustained by the presumption that findings supporting the judgment were made. *Habhegger v. King,* 149 Wis. 1, 135 N. W. 166; *Murray v. Paine L. Co.*

155 Wis. 409, 144 N. W. 982. Such assumed findings can support the judgment only in cases where the attention of the trial court has not been called to the issue. Sec. 2858*m*, Stats.

In cases where the evidence as to the issue thus omitted is conflicting or susceptible of different conclusions, the case will be reversed and remanded with directions to submit such issue to the jury. But where the facts are undisputed, or it is clear that only one proper conclusion thereon can be reached by reasonable men, this court will determine such issue and dispose of the case accordingly.

It is our conclusion that the question whether the plaintiff had a right to rely upon the representations made by the defendants as to the value of the plant must be answered in the negative upon practically undisputed testimony.

It appears that at the directors' meeting of May 4, 1914, one of the directors, Mr. Brown, expressed the view that the price asked was too high and that an appraisal be had. Mr. Boyd consented to a new appraisal provided the price fixed by the appraisers should be the purchase price. The directors did not desire an appraisal but voted unanimously to accept Boyd's written proposition. At the June meeting when the plant was finally bought, the question of price became a subject of such heated debate that one of the directors, Mr. Bosshard, resigned and left the meeting. The same offer as to an appraisal was again made by Boyd but rejected. The directors had before them the appraisals mentioned in the statement of facts; they had the report of a number of committees who had previously examined the plant, but above all they had the plant before them; that is, it was near by, open to their inspection, and a number of them had inspected it. Under such circumstances they had no right to rely upon the written offer as to value. It is claimed, but not proven, that the book value given in Exhibit 10 was too great. Concede that it was. The plant was there, had been inspected, and no claim is made that Boyd

did not invite inspection or that he sought to conceal or misrepresent the condition of any corporate part of the plant. His view that it would prove profitable in the hands of plaintiff was the expression of a mere opinion as to future success and could not form the basis of a misrepresentation. The law is well settled that where the question of value becomes a subject of discussion between buyer and seller, the duty to investigate follows where an investigation can conveniently be had. In *O'Day v. Meyers,* 147 Wis. 549, 554, 133 N. W. 605, the rule is thus stated:

"It is elementary that mere representations as to value, where the purchaser is presumed competent to judge thereof and has full opportunity to, and does, examine the property to be purchased, do not constitute false representations entitling the purchaser to rescind on that ground, even though relied upon by him. Such representations as to value constitute nothing more than the mere opinion of the seller," citing a large number of Wisconsin cases. See, also, *J. H. Clark Co. v. Rice,* 127 Wis. 451, 106 N. W. 231; *Morgan v. Hodge,* 145 Wis. 143, 129 N. W. 1083; *Miranovitz v. Gee,* 163 Wis. 246, 157 N. W. 790; *Karls v. Drake,* 168 Wis. 372, 170 N. W. 248; *Swoboda v. Rubin,* 169 Wis. 162, 170 N. W. 955.

In 12 Ruling Case Law, p. 361, the rule is expressed as follows:

"Where a party to whom representations are made is put upon inquiry by his knowledge of the facts and undertakes to make an investigation of his own, and the other party does nothing to prevent this investigation from being as full as the investigator chooses to make it, the investigator will not usually be heard to say that he had the right to rely on such representations."

Here the plaintiff had convenient opportunity for full examination as to condition and value of the plant. It is only where there is no opportunity for adequate examination that the purchaser may rely upon representations made. *Ohrmundt v. Spiegelhoff, ante,* p. 214, 184 N. W. 692. Thus,

much that plaintiff contends for may be true and yet legal liability on the part of the appealing defendants may not follow if it is shown that plaintiff, before making the! purchase, had its attention called to the high price and had an opportunity to ascertain the truth with respect thereto but refused or neglected to do so. In such event it must abide the consequences of its voluntary act even though it be a corporation and even though its directors may have been quite ignorant of the value of packing plants. If they were ignorant it was their duty to inform themselves. Plaintiff was engaged in the business of buying such a plant and was chargeable with the duty to exercise the ordinary and reasonable diligence of a buyer. *Ohrmundt v. Spiegelhoff, ante,* p. 214, 184 N. W. 692. It thus appears that plaintiff had no right to rely upon any representations made by the defendants and that therefore it has no cause of action against them.

The opinion might well end here, for the legal ground upon which the decision of this court is based is as stated. But in view of the gravity of the charges made by plaintiff against the defendants we deem it proper to state that we are also of the view that no conspiracy was shown in which any of the answering defendants participated. In coming to such conclusion the court has not been unmindful of the weight that should be given to the verdict—especially when approved by the trial court. Nor has it ignored the fact that fraud and conspiracy is usually proved by circumstantial evidence and that it may be satisfactorily shown by a combination of circumstances none of which alone has much probative force. Our conclusion has been reached not so much because of the weakness of disputed evidentiary facts which, but for other undisputed evidence, the jury might well resolve in favor of the plaintiff, but because of the positive evidence that the organization of the plaintiff was instituted by the farmers themselves for the purpose of building or purchasing a co-operative packing plant, notwith-

standing the fact that in the early proceedings the purchase of the Packing Company became the probable objective of the organization. Such conclusion is further strengthened by the fact that plaintiff operated the plant for two years and a half and then waited another two years before beginning action. Long before it ceased to operate the plant it knew its condition at the time of purchase, yet it made no claim that it had paid too much. Boyd ceased to be connected with the plaintiff's plant in 1915, and from then on it cannot be argued that plaintiff was still in the clutch of the alleged conspiracy. That plaintiff failed to make the plant a profitable one may be due to many causes. Its loss of $60,000 worth of meat in one year, due to inadequate refrigeration, may spell poor management. Its lack of success, together with that of many other co-operative ventures, which is a matter of common knowledge, may indicate that man is not yet altruistic enough to make them financially successful. But the success or failure of plaintiff's plant has only an indirect bearing on the question whether plaintiff was induced by actionable fraud or conspiracy to pay too much for it. If it was, it is entitled to its lawful damages. If it was not, it is immaterial whether it was a success or failure.

The substance of the claim of plaintiff is this: The defendants, for the purpose of securing a grossly excessive price for the Packing Company plant whereby the owners and the creditors would be fully reimbursed for their investment, conceived the scheme of forming a co-operative corporation under the laws of Wisconsin and selling the plant to them for such grossly excessive price. As evidence of such scheme the activities of Boyd, *Chryst,* Carnahan, Mahoney, and of the appellant defendants in the creation of the plaintiff corporation is relied upon. That Boyd, *Chryst,* Carnahan, and Mahoney were active in the formation of the plaintiff corporation is well established. But of these *Chryst* is the only appellant. Mahoney and Carnahan as well as

many other members and officers of the American Society
of Equity or of the Wisconsin Union thereof, who were also
very active, were not even made defendants. The strongest
evidence to show connection with the alleged conspiracy on
the part of the bank officers is claimed to be the fact that
they took stock in the plaintiff corporation in their own
names when the bank was the real owner thereof; that they
sold it before plaintiff became insolvent; and that they per-
mitted a publication of their names in the La Crosse papers
as subscribers of stock; also the fact that *Burton* expressed
the opinion that the purchase price was a stiff one and that
he thought Boyd had better sell for $60,000 if he could get
no more, and that Boyd paid for the five shares of stock
subscribed by *Chryst,* and the fact that the first $85,000 paid
on the purchase price was paid into the bank to liquidate its
indebtedness and that of preferred stockholders in the Pack-
ing Company. As further proof of a conspiracy it is shown
that the subscription blank used early in the formation of
the plaintiff spoke of the purchase of the Packing Company
plant, that *Chryst* spoke of such purpose in a letter during the
early organization proceedings. These are the main claims
made showing fraud. Many others are claimed to exist, and
the argument made on behalf of plaintiff is strong and per-
suasive, but we deem the conclusion it seeks to reach is not
sustained by the evidence.

The testimony as to the value of the Packing Company
took a wide range. By some witnesses it was placed less
than the value found by the jury and by some as high as the
price paid. It must therefore be assumed as a verity that the
value found by the jury has support in the evidence and can-
not be disturbed. But the very fact that there was such great
difference in opinion as to value by presumably competent
and disinterested witnesses has a very direct bearing upon
the question of fraud, for where competent honest men may
differ, fraud cannot be so unerringly inferred from a pur-
chase made within the limits of the testimony. The apprais-

als made by the men referred to in the statement of facts, and which were adopted by plaintiff as a basis for the price, showed the plant to be worth substantially what was paid for it.

But as before stated, the basis of our decision lies in the fact that plaintiff through committees of its own had several times inspected the plant for the purpose of ascertaining its value before the second directors' meeting when the purchase was finally decided upon; that at such meeting the value of the plant became a subject of sharp controversy; that the plant was close at hand and open to inspection before purchase; that the directors, notwithstanding the fact they had their attention called to the price, the adverse interest of Boyd and Johnson, nevertheless were satisfied to go on and complete the purchase relying upon inspections already made by its committees and upon appraisals before them. Under such circumstances, in the absence of any false representations made by the defendants—and there are none except perhaps as to the book value of the plant,—plaintiff must be held to have acted upon its own judgment, and if it erred it must bear the consequences. It will not do to say that plaintiff's directors were ignorant as to the value of packing plants. They had it within their power, and it was their duty to the stockholders, to inform themselves before making a purchase. They had informed themselves and they made further investigations that day by waiting for the appraisals mentioned before acting. Boyd's offer to have a new appraisal to determine the price was twice repeated. The fact that he asked a high price for the plant, in the absence of false representations, and with full opportunity to inspect, does not constitute fraud. Neither is a creditor guilty of fraud because he knows his debtor is endeavoring to sell his property at a high price where the creditor makes no representations of his own in regard to the matter.

But it is claimed by plaintiff that the fact that the directors of the bank subscribed for stock in the plaintiff com-

pany shows a participation in the fraud, and especially the fact that they disposed of their stock at an early day.

Courts should deal with practical matters in a practical way. La Crosse was a city of about 30,000 people. A large co-operative farmers' packing plant was to be established. A drive was made for that purpose, meetings were held. Newspapers were full of the enterprise. The defendants referred to, *Burton, Hixon, Funke,* Gund, and *Michel,* were old and prominent business men of the city, which depended for its prosperity largely upon the farmers. Let one of the witnesses, not a defendant, tell why subscriptions were made by the business men of La Crosse. Mr. Doerflinger, president of the board of trade, testified as follows:

"I subscribed for $1,000 stock in that enterprise because I was solicited. Naturally, I thought it a good thing; and as president of the board of trade and as a merchant here, we are always looking for things that are going to help the town. I did believe it was going to benefit the city, because when *Mr. Chryst* was here he gave us very good explanations; told us the places where they made big successes, the organizations of that kind. I did think and believe today that if it had been well managed it would have been a good thing for the city of La Crosse; we thought that if this was well managed it would prove a big thing for La Crosse. Mr. Brayton solicited my subscription. Mr. Brayton was editor of the Tribune. This is how he solicited my subscription: The thing didn't take a start very easy, so Mr. Brayton called me up. He says: 'Mr. Doerflinger, you will have to get on this list and start the thing moving.' He says, 'You are president of the board of trade, and of course the first thing people ask, "What is Doerflinger doing; he is hollering his head off about this thing, now what is he doing?"' Well of course, I put myself down for a thousand dollars."

Who can doubt the truth of Mr. Doerflinger's statements?

The defendants gave substantially the same reasons for their subscriptions, namely, that they thought it would be a good thing for the town; that they were expected to subscribe and did so. Later they sold their stock, but that was

when it was selling for more than par and Hall had sold more stock than he could deliver and came to *Burton* to help him out with his stock. Plaintiff's executive committee on May 4, 1914, voted that after the sale of the first $100,000 the next $50,000 should be sold at $105, and the next $50,000 at $110, and the next $50,000 at $115. The stock sold for above par the next fall, and some of the defendants resold their stock, *Burton* for the reason stated. No badge of fraud or conspiracy is perceived either in the subscription or resale of stock. Of course later, after the stock became worthless—a contingency not probable at the time of sale,— it can easily by argument be made to assume a sinister aspect. But conduct should be judged by the circumstances as they appear at the time and not by subsequent events.

As before stated, *Chryst* was president of the American Society of Equity, Carnahan was president of the Wisconsin Union and chairman of the packing-plant committee of both organizations. D. O. Mahoney was county judge of Vernon county and for six or seven years president of the Wisconsin Union of the American Society of Equity. All these men were eager for a co-operative packing plant and worked zealously for it without remuneration, except that *Chryst* received a few shares of stock from Boyd, who wanted to reimburse him in part for his time and services. That such men should betray their trust to the organization that had honored them with the highest offices at their command is not very credible; that they should do it without any substantial compensation is highly incredible. It may have been a case where their zeal outran their judgment. That often happens to the best of men. Certain it is that during the period mentioned there was great activity among the farmers in the formation of their co-operative enterprises.

That the officers of the bank should have joined in a conspiracy to defraud the farming community upon whose prosperity their bank ultimately depended does not seem plausible unless a very strong motive is shown. The motive claimed is that in that way the bank could secure the pay-

ment of the indebtedness of $55,000 which the Packing Company owed the bank. The force of this motive becomes less apparent when it is remembered that the value put upon the plant by the jury plus the other assets of the company was ample to take care of this indebtedness and practically of the whole indebtedness of the plant. There is no proof that *Isabella Boyd* said or did anything to aid the alleged conspiracy except to subscribe for some stock in the plaintiff company. She was Boyd's sister and had been his book-keeper. The chief argument to show her guilt is based upon the fact that she did not testify at the trial though present. Her failure so to do is not of itself a sufficient basis for finding her guilty. Verdicts should rest upon more substantial grounds.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment dismissing the complaint upon the merits.

OWEN and JONES, JJ., dissent.

A motion for a rehearing was denied, with $25 costs, on January 10, 1922.